People of the State of Illinois ex rel. William D. Cazel, Appellee, v. Board of Trustees of Policemen's Pension Fund of the Village of Winnetka et al., Appellants.

Gen. No. 41,606.

Opinion filed March 2, 1943.

DICKINSON, SPROWL, NORVILLE & JAMES, of Chicago, for appellants; FREDERICK DICKINSON and EDWARD J. WENDROW, both of Chicago, of counsel.

CARL E. BUDDENBAUM, of Chicago, for appellee.

MR. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court.

A petition for a writ of mandamus was filed to compel the defendants, Board of Trustees of Policemen's Pension Fund of the Village of Winnetka and Lamson H. Date, George W. Gordon and Harry C. Enault, trustees thereof (hereinafter sometimes referred to collectively as the Police Pension Board), to place upon the pension roll of said fund relator William D. Cazel, a former policeman of the Village of Winnetka, and to pay him therefrom $90 a month, same being half of his monthly salary while he was a member of the Winnetka police force.

The legal sufficiency of the petition was raised by various motions filed by defendants. After several amendments to the petition were filed, the motion of defendants to dismiss said petition as amended was denied and defendants filed their answer. Harve H. Page and John F. Manierre, having become trustees of the police pension fund, were substituted as defendants in place of Lamson H. Date and George W. Gordon.

On September 17, 1940 a judgment order was entered by the trial court which directed that a peremptory writ of mandamus issue commanding defendants "to forthwith enroll the Relator herein, William D. Cazel, as one of the beneficiaries of the said Policemen's Pension Fund of the Village of Winnetka, from and as of the first day of July, 1936; and they and each

of them are hereby ordered and directed to pay to the said Relator a monthly pension equal to one-half of the amount of salary of $180 a month, attached to the rank of Patrolman, Second Class, which he held in the said Police Department of the Village of Winnetka on July 1, 1936.'' Defendants appeal from this judgment order.

Upon the trial of this cause a report of the Police Pension Board as to the facts submitted to it on the relator's application for pension, its conclusions relative thereto and its decision denying such application was offered and received in evidence. This report is as follows:

''Record of an adjourned meeting of the Winnetka Police Pension Board, held in the Committee room in the Village Hall, on September 30th, 1936 at eight o'clock P. M.

''There were present: Lamson H. Date, Chairman; George W. Gordon and Harry C. Enault.

''The matter of the application of William D. Cazel for pension was considered, and George W. Gordon presented the following statement of facts, and conclusions of the Board, to-wit:

''STATEMENT OF FACTS.

''The applicant, William D. Cazel, became a member of the Winnetka Police Force in June, 1925. Previously he had been engaged in farming in Southern Illinois, where he had lived the usual outdoor life incident to such occupation.

''According to records of the Winnetka Police Department, the applicant was born November 8, 1880. His height is 5 feet, 8½ inches. His present weight (taken from report of June 26, 1936) is 206 pounds. In 1925 when he came on the Winnetka Force, his weight was approximately 185 pounds.

''On or about June 30, 1936, the applicant was notified by Chief of Police Peterson that he was released or discharged from the Police Department on account

.of his physical condition and inability to perform the duties of his office, his dismissal to be effective July 1, 1936.

"This Board has had several meetings at which the Cazel application has been considered. The following witnesses appeared personally before the Board and gave testimony: The applicant, William D. Cazel, Chief of Police W. M. Peterson, Clarence Minnema, M. D., H. A. Orvis, M. D., Village Health Officer. The following documentary evidence was submitted and considered:

"1. Letter of applicant to Police Pension Board, dated July 14, 1936, making application for pension:

"2. Written statement of applicant in form of letter to Police Pension Board dated September 23, 1936;

"3. Statement of John H. Gormley, M. D., dated May 30, 1932;

"4. Report dated June 25, 1934, to Dr. Orvis, Village Health Officer, made by Byron Francis, M. D. Department of Medicine, the University of Chicago;

"5. Letter of Samuel J. Lang, M. D., to Dr. Clarence Minnema, dated April 9, 1936;

"6. Letter of Samuel J. Lang, M. D., to Lamson H. Date, Chairman, Police Pension Board, dated July 28, 1936;

"7. Letter of Jay M. Garner, M. D. to Mr. Lamson H. Date, Chairman, Police Pension Board, dated August 13, 1936;

"8. Report of medical examination of employees made by Clarence Minnema, M. D., covering medical examination of applicant and dated June 26, 1936;

"9. Report of Dr. H. A. Orvis, Village Health Officer, dated August 6, 1936;

"10. Undated written statement signed by applicant entitled, 'Report of my case of Feb.'; and,

"11. Letter of C. Minnema, M. D. to Pension Board, dated September 25, 1936.

"There was also submitted to this Board the records of the Police Department of the Village of Winnetka covering applicant's original application for employment by the Police Department and said Department's records covering applicant's sick absences from duty. Such absences thus shown by Police Department records from January 1, 1931 to June 30, 1936, are as follows:

| Year | Days | Year | Days |
|------|------|------|------|
| 1931 | 17 | 1934 | 15 |
| 1932 | 27 | 1935 | 25 |
| 1933 | 7 | 1936 (to June 30th) | 144 |

Total sick absences from January 1, 1931 to
    June 30, 1936, inclusive..............235 days

"The duties of the applicant as a police officer required the officer to do patrol duty on foot, the hours of such patrol frequently including night duties and a beat, or assignment, of eight hours of such service. It was stated to the Board by the Chief of Police, and also stated by Captain Enault of the Board, that officers on patrol duty on foot were not required to be continually on their feet during any particular beat. The officer is merely required to cover a certain territory and turn in certain signal or station reports. The duties of the officer also include patrol work in the police cars, and this also may require night service.

"This Board is satisfied from the evidence submitted that the applicant at the time of his dismissal from the Winnetka Police Department had become and was physically incapacitated for the performance of the duties of a police officer and that such disability still continues and did incapacitate the applicant for the duties of a police officer.

"The applicant, in answers to questions from the Board, cited only two specific instances of possible

causes of his present disability. These were (1) the fact that during the years 1928, 1929, 1930 and 1931, his work was mostly riding the squad cars which were unheated, and the fact that his prescribed uniform required the wearing of breeches with puttees, which the applicant claimed so bound his legs as to cause poor circulation in his feet. He stated that his doctor advised him to quit wearing puttees and to do more walking, which Chief Peterson permitted him to do; that thereafter he got along very well for a while, but having to do night work nearly all the time, he got very little sunshine and began having more trouble; and (2) in February, 1936, on a day when the temperature was about 20 degrees below zero, witness states that he was doing traffic duty in the Hubbard Woods section of Winnetka, and in so doing, froze his feet and legs, which caused him to be unable to work after February 19, 1936.

"Assuming, on the evidence submitted to the Board, that the applicant has become disabled for the performance of the duties required of him on the Police Force, the question for our decision becomes (to quote from the rules of the Statutes governing eligibility to pension on account of disability) whether the applicant has become, 'physically disabled while in *and in consequence of* the performance of his duty as such a policeman to such an extent as to necessitate the suspending of performance of his duty on such police force or retirement from the police force.' It is further the opinion of this Board that the determination of the above question becomes largely a medical question, and that the answer must chiefly depend upon the medical reports and statement of physicians who have examined the applicant during the period of his disability and ailments. The first medical report is that of Dr. Gormley, dated May 30, 1932, in which he states that the applicant was then suffering from acute artic-

ular rheumatism. The medical report of Dr. Francis of the Department of Medicine, The University of Chicago, dated June 25, 1934, reports on an examination of Mr. Cazel in the University of Chicago Clinics on June 12, 1934. This report states that on the basis of the history and physical findings, a tentative diagnosis of *gout* was made. The report further states that X-rays of the affected portions of the feet are compatible with the clinical diagnosis of *gout*. The patient was by this report advised to submit to a reduction of diet, and the statement is made that, 'in view of the fact that he is evidently suffering from a recurrence of gout, a low Purine intake was also advised.' Treatment recommended by this report was largely dietary, with the suggestion that if symptoms of gout became acute again, the drug Colchicum might be given, which drug the patient's physician had previously prescribed.

"According to the statements of Dr. Lang, and particularly those in his letter of July 28, 1936, to Mr. Date, Chairman of this Board, Dr. Lang stated that he had seen Mr. Cazel in March or April, 1936, at his home and later at the Evanston Hospital; that the principal factor was hypertrophic arthritis of the weight-bearing joints, which he states means a wear-and-tear effect from excess weight and an occupation requiring constant hammering from hard pavements; that infection has little or no part to play in the picture. Dr. Lang's letter continues by stating that gout was considered because of pain in the great toe, and may have had something to do with that portion of the patient's trouble. In this letter Dr. Lang states that, 'In evaluating the case, our Pension Board should consider the effects of hard pavements, exposure and the condition of the applicant when he entered the service. Obesity markedly accentuates and accelerates such a process, and unless the department has provisions

against overweight, I should think its effect could not be considered in arriving at a conclusion.'

"Dr. Garner's statement in his letter of August 13, 1936, recites that he attended Mr. Cazel in 1928 and 1929 for an acute gall stone attack, and in July of 1932 for an acute gout of both great toes. Dr. Garner states, 'I am unable to state definitely that the police duties were the etiological factor, but walking his beat certainly aggravated the condition at that time.'

"In his verbal statements when he appeared before the Board, Dr. Minnema stated that he attributed Mr. Cazel's condition of disability chiefly to a gouty condition and the patient's failure to carry out proper and prescribed diet and care.

"The applicant, in addition to the statements in his letter of September 23, 1936, and in his undated report of his case of February, had verbally stated to the Board that on said occasion in February, 1936, he had frozen his feet or legs, and that such exposure and freezing had caused his disability, and that it was upon said exposure, while in the performance of his duties, that he based his claim and right to a pension. The applicant referred the Board to Dr. C. Minnema who, the applicant stated, had been consulted by the applicant at the time of or shortly following said exposure and freezing. Dr. C. Minnema, in his letter of September 25, 1936 to this Board, reported that the attack of arthritis which the applicant had the latter part of February, 1936, and for which he attended the applicant was, he believed, aggravated by the applicant's work during the preceding spell of cold weather. Dr. Minnema, however, stated verbally to the Board that, in his opinion, the witness did not freeze his feet at the time mentioned by the applicant and that he regarded the applicant's subsequent disability as aggravated rather than caused by such exposure.

"Dr. Orvis, in his report dated August 6, 1936, recited that he had been called upon to arrange for a

complete physical examination for Mr. Cazel in June, 1934, and that he had arranged for The University of Chicago Clinic's examination, which is mentioned above. Dr. Orvis analyzed said report as giving a diagnosis of gout. He states that he finds nothing recorded in the several medical reports submitted, as above recited, to indicate any injury either to the feet or other part of the body. He states, 'The disability of the feet, especially the right, in my opinion is due to gouty deposits and changes of the bones of the feet which will be chronic. The cause of this condition is an inherited tendency, together with excessive eating and perhaps the use of alcohol (even though it be conservatively used).' Dr. Orvis' written statement concludes as follows: 'Whereas activity on his feet may have aggravated the discomfort in his feet, I do not believe it to be the primary cause of this trouble.'

"Conclusions.

"Based upon the evidence submitted to and considered by this Board, as hereinbefore set forth, it is the opinion and conclusion of this Board (1) that the applicant is now physically incapacitated to perform the duties of a police officer and that he became physically disabled while a member of the Police Force of the Village of Winnetka; (2) that although the applicant had become so physically disabled while a member of said Police Force he did not become so physically disabled 'in consequence of the performance of his duty as such policeman.'

"Inasmuch as the Statute of the State of Illinois governing the rights of members of the Police Force of the Village of Winnetka to a pension from the Winnetka Police Pension Fund requires both that the applicant shall have become disabled while a member of the Police Force and that his disability must have been incurred in the performance of his duty as a police-

man, the application of the applicant, William D. Cazel, for a pension must be denied.

(sgd.)      HARRY C. ENAULT,
(sgd.)      GEORGE W. GORDON,
(sgd.)      LAMSON H. DATE,
*Chairman.*

"Dated: September 30, 1936.

"On motion of Harry C. Enault, seconded by George W. Gordon, said statement and report were unanimously adopted."

The only other evidence presented upon the trial of this cause in the circuit court was the testimony of three physicians. Two of these physicians testified to substantially the same effect as they had before the Police Pension Board and the testimony of the third physician was in accord with the evidence submitted by the other physicians as shown by the report of the Police Pension Board. There is no controversy as to the facts found in said report.

Section 4 of the Police Pension Act (par. 895, ch. 24, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 100.260]), under which this action was brought, is as follows:

"4. Whenever any policeman, while serving as such, in any such city, village or incorporated town, *shall become physically disabled while in and in consequence of the performance of his duty as such policeman, to such an extent as to necessitate the suspending of performance of his duty on such police force,* or retirement from the police force, said board shall order and direct that he be paid from said fund a pension of one-half (½) of the salary attached to the rank he may have held on said police force for one year immediately prior to the time of his so suspending performance of his duty or retirement; Provided, that whenever such disability shall cease and said policeman shall resume the performance of his duty on said police force such pension shall cease." (Italics ours.)

The principal question presented for determination is whether the trial court erred in its interpretation of that provision of section 4 of the Police Pension Act which reads: "Whenever any policeman, while serving as such, . . . shall become physically disabled while in and *in consequence of the performance of his duty as such policeman,* to such an extent as to necessitate the suspending of performance of his duty on such police force, . . . said board shall order and direct that he be paid from said fund a pension of one-half (½) of the salary attached to the rank he may have held on said police force for one year immediately prior to the time of his so suspending performance of his duty. . . ." (Italics ours.) There is no question but that Cazel was physically incapacitated to perform the duties of a police officer at the time of his discharge or when he filed his application for pension or that he became physically incapacitated while a member of the police force of the Village of Winnetka to the extent that he was no longer able to perform his police duties. The real controversy here is whether he became physically disabled "in consequence of the performance of his duty as such policeman."

The evidence adduced upon the trial discloses that Cazel was afflicted with arthritis when he became a member of the police force in 1925. While he continued to be so afflicted his ailment did not entirely impair his ability to perform his police duties. From 1931 on his arthritic condition became progressively worse and he also developed a "gouty condition." His weight increased to 206 pounds. The treatment prescribed for his ailments and his obesity by the various physicians who attended him during the period from 1931 to July 1, 1936, when he was discharged from the police force, was chiefly dietary and excluded the use of alcohol. Cazel failed to cooperate with his physicians in the matter of his diet. It is undisputed

in the record that the arthritic condition of Cazel's weight bearing joints and his gout were aggravated by the necessity of his walking on hard pavements in the performance of his police duties. It is also undisputed that his arthritis and gout were likewise aggravated by his obesity. After his extended absence from duty for 144 days in 1936, because of his physical inability to work, Cazel was discharged from the Winnetka police force on July 1, 1936, as heretofore shown. Since the Winnetka Police Force was not under Civil Service, Cazel could have been discharged either with or without cause at any time but there is no question involved herein concerning the propriety of his discharge.

The Police Pension Board found that Cazel did not "become physically disabled *in consequence* of the performance of his duty as such policeman, to such an extent as to necessitate" his discharge from the police force. The trial judge found that plaintiff's maladies were not brought about *"in consequence"* of the performance of his duty as a policeman but he then went on to find that the language "to such an extent as to necessitate the suspending of performance of his duty on such police force," in the section of the statute in question made it necessary to construe this section of the statute. The trial judge then found that because of the use of the language last above quoted the section of the statute under consideration could only have been intended by the legislature to mean that although plaintiff's ailments were admittedly not brought about *in consequence* of his police duties, the aggravation of his ailments did result in consequence of the performance of such duties and that since it was the aggravation of his ailments rather than the ailments themselves, which caused his physical disability, Cazel was entitled to the allowance of the pension applied for.

We do not think that any language contained in section 4 of the Pension Act, heretofore set forth, is susceptible of any such interpretation. In our opinion the

language of the statute is clear, plain and unambiguous and it contemplated that only those who became physically disabled to such an exent as to require their discharge or retirement by reason of disease or injuries suffered while they were members of the police force and *in consequence* or as a result of the performance of their police duties, were entitled to receive the disability pension the statute provided for. The words "to such an extent as to necessitate" suspension or retirement, upon which the trial court based its construction of the statute, merely qualify the words "physically disabled" and were only intended to indicate the degree of physical incapacity that required "the suspending of performance of his duty" of a member of the Winnetka police force.

That Cazel did not base his claim of right to the pension upon the aggravation of his ailments by his walking on hard pavements is clearly indicated by the following portion of the report of the Police Pension Board:

"The applicant, in answers to questions from the Board, cited only two specific instances of possible causes of his present disability. These were (1) the fact that during the years 1928, 1929, 1930 and 1931, his work was mostly riding the squad cars which were unheated, and the fact that his prescribed uniform required the wearing of breeches with puttees, which the applicant claimed so bound his legs as to cause poor circulation in his feet. He stated that his doctor advised him to quit wearing puttees and to do more walking, which Chief Peterson permitted him to do; that hereafter he got along very well for a while, but having to do night work nearly all the time, he got very little sunshine and began having more trouble; and, (2) in February, 1936, on a day when the temperature was about 20 degrees below zero, witness states that he was doing traffic duty in the Hubbard Woods section of Winnetka, and in so doing froze his feet and

legs, which caused him to be unable to work after February 19, 1936.''

Cazel never returned to work after February 19, 1936. It will be noted that he testified before the Police Pension Board that on that date his feet and legs were frozen as a result of performing traffic duty in subzero weather. The physician who attended him at that time stated that his feet and legs had not been frozen on that occasion but that the extreme cold weather aggravated his arthritis and gout. It is clear from the foregoing portion of said report that the chief of police of Winnetka would have been warranted in discharging Cazel as far back as 1931 and even prior thereto because of his disabling ailments but every consideration was shown him. After he had been assigned to duty riding in a police car for a number of years, Cazel couldn't stand that. While on that duty he sat down most of the time in the police car but he complained that the breeches and puttees which he was required to wear as part of the regulation police uniform interfered with the circulation of blood in his feet. He complained to the chief of police concerning said breeches and puttees and he was thereafter excused from wearing same. While he was assigned to duty in the police car one of his physicians advised him that it would be beneficial if he walked more. At his request he was given an assignment traveling ''beat'' but it then appears that he could not walk on the hard pavements without aggravating his maladies. As has been already indicated his diseased condition prevented him from performing his police duties in extreme cold weather. He stated himself that because ''he got very little sunshine'' he ''began having more trouble.'' So it is that his ailments precluded him from properly performing any ordinary police duties. It appears conclusively that his physical disability was caused by his diseased condition and that, since it is admitted that his diseased condition was not brought

about *in consequence* of the performance of his duties as a policeman, the Police Pension Board was justified in deciding that he was not entitled to a disability pension under the statute. There was no abuse of discretion on the part of the Police Pension Board in regard to the conclusion reached by it. Plaintiff was afforded a full and fair hearing and the evidence adduced before said board amply sustained its findings and conclusions.

Other points are urged for reversal but in the view we take of this case we deem it unnecessary to discuss them.

The judgment of the circuit court of Cook county ordering that a writ of mandamus issue is reversed.

*Judgment reversed.*

FRIEND and SCANLAN, JJ., concur.